**PUBLIC VERSION**

███████████████████████████████

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| Q TECHNOLOGIES, INC., | Case No. 6:21-cv-0779-ADA |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | ORAL ARGUMENT REQUESTED |
| WALMART INC., | ████████████████ |
| Defendant. | |

## DEFENDANT WALMART INC.'S MOTION FOR SUMMARY JUDGMENT OF PATENT INELIGIBILITY PURSUANT TO 35 U.S.C. SECTION 101

**PUBLIC VERSION**

███████████████████████████████

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................ 2

III.    THE TECHNOLOGY OF THE ASSERTED PATENTS .................................................. 3

    A.      The Asserted Claims Are All Directed to Content Sharing Using a Unique Identifier on General-Purpose Devices .................................................... 3

    B.      The Patentee Admits That the Purported "Inventive Concept" of the Asserted Claims Was Already Known ......................................................... 6

IV.     PATENT INELIGIBILITY UNDER *ALICE* MAY BE DETERMINED AT SUMMARY JUDGMENT ...................................................................................... 9

V.      THE ASSERTED CLAIMS FAIL *ALICE* STEP ONE .......................................... 10

    A.      The Claimed Steps Have Long Been Performed by Human Minds, Pen and Paper, and Early Computing Systems................................................... 11

    B.      The Federal Circuit Has Repeatedly Found Similar Claims to be Abstract – and Patent Ineligible ........................................................................... 15

    C.      The Asserted Claims Do Not Fall Within the *DDR Holdings* Category of Patent-Eligible Computer-Implemented Patent Claims........................... 20

VI.     THE ASSERTED CLAIMS FAIL *ALICE* STEP TWO ........................................ 24

    A.      The Asserted Claims Recite Conventional Tools, Not An "Inventive Concept" ................................................................................................. 24

    B.      The Claimed Steps Are Generic Functional Language, Not an "Inventive Concept" ................................................................................................. 26

    C.      Q Tech's Latest "Inventive Concept" Is Not Claimed and Therefore Irrelevant ............................................................................................... 27

VII.    BINDING ADMISSIONS FORECLOSE A "GENUINE" DISPUTE OVER ANY MATERIAL FACTS .......................................................................................... 28

VIII.   CONCLUSORY EXPERT OPINION CANNOT MANUFACTURE A GENUINE ISSUE OF MATERIAL FACT ............................................................ 29

IX.     THE ASSERTED CLAIMS FAIL BOTH STEPS OF *ALICE* AND ARE PATENT INELIGIBLE UNDER SECTION 101 ..................................................... 33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alice Corp. Pty. v. CLS Bank Int'l*,
573 U.S. 208 (2014)............................................................................................ *passim*

*Am. Axle v. Neapco*,
967 F.3d 1285 (Fed. Cir. 2020)........................................................................10, 28, 30

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018)..................................................................................9, 33

*Berkheimer v. HP Inc.*,
890 F.3d 1369 (Fed. Cir. 2018)..................................................................................28

*Boom! Payments, Inc. v. Stripe, Inc.*,
839 F. App'x 528 (Fed. Cir. 2021) ...............................................................................5

*Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*,
955 F.3d 971 (Fed. Cir. 2020)....................................................................................24

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*,
778 F. App'x 882 (Fed. Cir. 2019) ..................................................................... *passim*

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018)..................................................................................24

*Content Extraction & Transmission LLC v. Wells Fargo Bank*,
776 F.3d 1343 (Fed. Cir. 2014)..................................................................................24

*Customedia Techs., LLC v. Dish Network Corp.*,
951 F.3d 1359 (Fed. Cir. 2020)..................................................................................23

*DDR Holdings, LLC v. Hotels.com*,
773 F.3d 1245 (Fed. Cir. 2014)........................................................................20, 21, 23

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016)..................................................................................5, 27

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)..................................................................................15

*K-TEC, Inc. v. Vita-Mix Corp.*,
696 F.3d 1364 (Fed. Cir. 2012)..................................................................................30

███████████████████████████████████████

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   566 U.S. 66 (2012)..................................................................................................10

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
   811 F.3d 1314 (Fed. Cir. 2016)..............................................................................9

*NexusCard, Inc. v. Kroger Co.*,
   173 F. Supp. 3d 462 (E.D. Tex. 2016), *aff'd*, 688 F. App'x 916 (Fed. Cir. 2017)..............18

*PersonalWeb Techs. LLC v. Google LLC*,
   8 F.4th 1310 (Fed. Cir. 2021) ....................................................................19, 20, 25

*Reckitt Benckiser LLC v. Aurobindo Pharma. Ltd. et al*,
   1-14-cv-01203, Dkt. 174 (D. Del. Mar. 6, 2017)....................................................30

*RecogniCorp, LLC v. Nintendo Co.*,
   855 F.3d 1322 (Fed. Cir. 2017)..............................................................................24

*SAP AM., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018)..............................................................11, 21, 22

*Secured Mail Sols. LLC v. Univ. Wilde, Inc.*,
   873 F.3d 905 (Fed. Cir. 2017)........................................................... *passim*

*Sensormatic Elecs. v. Wyze Labs*,
   No. 2020-2320, 2021 WL 2944838 (Fed. Cir. July 14, 2021)................................24

*Solutran, Inc. v. Elavon, Inc.*,
   931 F.3d 1161 (Fed. Cir. 2019)......................................................................10, 28

*In re TLI Commc'ns Patent Litig.*,
   823 F.3d 607 (Fed. Cir. 2016)................................................................................24

*Two-Way Media Ltd. V. Comcast Cable Commc'ns, LLC*,
   874 F.3d 1329 (Fed. Cir. 2017)..................................................................26, 27, 30

*Universal Secure Registry v. Apple Inc.*,
   10 F.4th 1342 (Fed. Cir. 2021) ................................................................10, 20

*USC IP v. Facebook, Inc.*,
   No. 6:20-CV-00555-ADA, 576 F.Supp.3d 446 (W.D. Tex. Dec. 20, 2021)
   (Albright, J.)..................................................................................9, 20, 21

**Statutes**

35 U.S.C. § 101............................................................................................. *passim*

## I.    INTRODUCTION

The Asserted Patents fail both steps of the Supreme Court's two-step analysis for patent eligibility as set forth in *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014). The Asserted Claims – which claim systems and methods for sharing content using a unique identifier – are directed to mere abstract ideas, not a particular improvement in technology.  Those abstract ideas also fail to embody an inventive concept. For these reasons, Defendant Walmart Inc. ("Walmart") moves for summary judgment of patent ineligibility under 35 U.S.C. § 101.

First, the Asserted Claims are directed to an abstract concept and *not* a particular improvement in technology. The claimed content-sharing method using an identifier has long been practiced in the human mind, with pen and paper, and in early computing systems.  This method is easily illustrated through two examples: libraries and ticketing systems. *Infra* Section V.A. The Asserted Claims "are not inherently related to any particular computer or other apparatus," but instead recite general-purpose computer systems such as "a computer," "a server," and "a smartphone." *Infra* Section V.C. The Asserted Claims therefore fail *Alice* Step 1.

Second, the Asserted Claims fail to recite an inventive concept that could support patent eligibility on the otherwise abstract concept. Indeed, the Asserted Claims fail to articulate any inventive concept beyond the abstract idea itself: using a unique identifier to share content. The Asserted Claims rely on general-purpose tools to implement functional information exchange, with steps specified at a high level of generality: "receiving," "generating," "storing," and "determining" conventional information, like QR code data or an alphanumeric key as an identifier. *Infra* Sections VI.A. and VI.B. Nothing in the Asserted Claims amounts to an inventive concept that would confer patent eligibility at *Alice* Step 2.

This issue is ripe for summary judgment, and neither generic allegations of "factual issues" by Plaintiff Q Technologies, Inc. ("Q Tech") nor conclusory statements by its expert can save the

day. *Infra* Sections VII and VIII. The Federal Circuit regularly deems claims ineligible as a matter

of law at summary judgment – including several cases that closely mirror the one at hand. If the

Court accepts *any* of the arguments presented herein, the Asserted Claims are not patent eligible.

Walmart requests that the Court grant summary judgment that the Asserted Claims are

patent ineligible under 35 U.S.C. § 101.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

**1.**      On July 29, 2021, Plaintiff Q Technologies, Inc. filed a complaint against Walmart
Inc. alleging infringement of U.S. Patent Nos. 9,635,108 (the "'108 Patent"), 10,567,473 (the
"'473 Patent"), and 10,594,774 (the "'774 Patent"). Dkt. No. 1. On October 4, 2021, Walmart filed
its answer to Q Technologies' complaint.  Dkt. No. 10. On July 25, 2022, Q Technologies filed its
first amended complaint, asserting the same patents against Walmart Inc. Dkt. No. 43. On August
8, 2022, Walmart filed its answer to Q Technologies' amended complaint. Dkt. No. 44.

**2.**      The asserted '108 patent issued on April 25, 2017 from U.S. Application No.
14/604,297 (the "'297 Application"). The '108 Patent claims a priority date of January 25, 2014,
based on U.S. provisional application No. 61/931,562 (the "'562 Provisional").

**3.**      The '562 Provisional states the Field of the Invention, which is described as
"directed to a person wanting to share files, rich-media or other content by using a PIN to grant
access." Ex. 1 ('562 Provisional App) at QTCH002232. The '562 Provisional distinguishes
between "[c]urrent file, rich-media and content sharing [which is] limited to URL sharing to grant
access" and the purportedly new ability to share/access files, rich-media or other content by
"entering a PIN (unique string of characters)." *Id.*

**4.**      On September 19, 2016, the United States Patent & Trademark Office ("USPTO")
issued a rejection of the '297 Application under *Alice* Step 1 and 2. Ex. 2 (Sept. 19, 2016 OA) at
QTCH0001036-37. On October 24, 2016, Applicant filed a response asking the USPTO to
withdraw the § 101 rejection based on Applicant's argument that the claims "define a new and
useful process for sharing content where the order of execution and simplicity of the input of solely
the generated unique identifier (from the second device) allows for distinct forms of shared data
to efficiently pass from device to device by humans." Ex. 3 (Oct. 24, 2016 OA Resp.) at
QTCH0001004-05. The examiner did not acknowledge Applicant's § 101 argument but did not
maintain that § 101 rejection. Ex. 4 (Dec. 14, 2016 OA).

**5.**      The USPTO issued a notice of allowance on March 9, 2017. While the "Examiner's
Statement of Reasons for Allowance discusses anticipation and obviousness, it is silent on § 101.
Ex. 5 (Mar. 9, 2017 NOA) at QTCH0000894-95.

**6.**      The asserted '473 patent is a continuation of the '297 Application which issued as
the '108 Patent. The '473 Patent claims a priority date of January 25, 2014, and issued on February

18. 2020. It shares a substantially identical specification with the '108 Patent, and does not differ in any respect pertinent to eligibility.

    **7.**    The asserted '774 patent is also continuation of the '297 Application which issued as the '108 Patent. The '473 Patent claims a priority date of January 25, 2014, and issued on March 17, 2020. It shares a substantially identical specification with the '108 Patent, and does not differ in any respect pertinent to eligibility.

    **8.**    The USPTO did not reject the applications that matured into the issued '473 Patent or the '774 Patent under § 101.

    **9.**    Q Technologies alleges Walmart infringes claims 1 and 10 of the '108 patent, claims 14 and 16 of the '473 patent, and claims 1, 3, 4, and 14 of the '774 patent (collectively, the "Asserted Claims" of the "Asserted Patents").

## III.    THE TECHNOLOGY OF THE ASSERTED PATENTS

### A.    The Asserted Claims Are All Directed to Content Sharing Using a Unique Identifier on General-Purpose Devices

The Asserted Patents, which are related and share the same disclosure, relate to "systems and methods for content sharing using uniquely generated identifiers." '108, '473, '774 patents shared Title. Each patent discloses sharing content using a first device, a second device, and a server.



'108 Patent, Fig. 1.

The principal components involved in the content sharing-related communications are the "server," which maintains the shared content information and allows "clients" (mobile devices / computers) in communication with it to access that content using a unique identifier. The Asserted Patents generally describe the first client/device sending a shared content to the server, the server storing the shared content with a unique identifier, the first client/device communicating the unique

███████████████████████████████████████████████████

identifier to the second client/device, the second client/device sending a request to the server for the shared content using the unique identifier, and the server transmitting the shared content to the second client/device upon determining that the unique identifier is associated with the shared content. '108 patent at 1:23-38, claim 1; '473 patent at 1:26-38, claim 14; '774 patent at 1:26-38, claim 1.

In all instances, the claimed structure is nothing more than generic technology, including "a server," "a smartphone," and "a computer." In fact, plaintiff's own expert acknowledges that the claimed structure is merely conventional hardware. Specifically, Dr. Akl admits that █

███████████████████████████████████████████████████

███████████████████████████████████████████████████ " Ex. 6 (Akl Rpt.) ¶ 153.

The Asserted Claims do not recite any more specific or unique structure whatsoever, and the Asserted Patents admit that the claimed content-sharing method can be carried out with "all kinds of apparatus, devices, and machines for processing data." '108 patent at 16:52-55. Indeed, in one embodiment, the claims contemplate sharing the unique identifier *verbally* between users before sharing content – a computer may not even be necessary. '108 patent at 4:25-28.

Specifically, claim 1 of the '108 patent recites:

1. A method for sharing content, comprising:
   a server, configured to communicate to a first and second client;
   receiving, at a server, from a first client, a shared content, and a unique identifier generated by a computer application running on the first client or server, for the shared content;
   wherein the unique identifier comprises one of: a QR code, bar code, RFID tag, hexadecimal number, alphanumeric key, ASCII key, or UNICODE string;
   receiving, at the second client, the unique identifier, from the first client;
   wherein the second client receives the unique identifier via: Bluetooth, Bluetooth Low Energy, NFC, Barcode or QR code scan, RFID tag scan, or

communication from a first user of the first client to a second user of the second client;

determining, at the server, that the second client is within a predefined distance from the first client by receiving location information from the first or second client;

Wherein the server determines that the first client is within a predefined distance from the second via: Bluetooth proximity, Bluetooth Low Energy proximity, NFC, Barcode or QR code scan, Ultrasonic sound, IP address triangulation of the clients, RFID scan, communication from a first user of the first client to a second user of the second client, or by determining that the location of the first client is within the same area as the location of the second client;

notifying, the second client of the shared content responsive to the determination;

receiving, at the server, a request from a second client, the request comprising the unique identifier

determining, at the server, that the unique identifier is associated with the shared content; and

sending the shared content to the second client responsive to that determination.

*Id*., Claim 1.

Courts regularly treat a claim as representative of other claims where the claims have substantial similarity or where the patentee does not offer any "distinctive significance" relative to other claims. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016); *Boom! Payments, Inc. v. Stripe, Inc.*, 839 F. App'x 528, 534 (Fed. Cir. 2021). Here, claim 1 of the '108 patent is representative of all Asserted Claims for purposes of this motion because it is directed to substantially similar subject matter as the remaining claims. Claim 10 of the '108 patent is substantially similar to claim 1, it is an apparatus claim counterpart to claim 1. Claim 14 of the '473 patent and claim 1 of the '774 patent are similar to claim 1 of the '108 patent, but do not require the location-related elements of claim 1 of the '108 patent. *See* '473 patent, claim 14; '774 patent, claim 1. The asserted dependent claims add nothing unconventional or inventive to the asserted independent claims. For example, claim 16 of the '473 Patent merely adds that "the server [be] further configured to execute instructions that cause the server to receive the unique identifier

█████████████████████████████████████████████████

from the computing device." Claim 3 of the '774 Patent recites the same language. Claim 4 of the

'774 Patent recites simply, "wherein the computing device generates the unique identifier." None

of these claims identify any special methods, interfaces, protocols, or data structures.

    Q Tech and its experts also treat the  Asserted Claims similarly. For example, Dr. Brogioli

████████████████████████████████████████████████████

███████████████████████████████████████. Ex. 7 (Brogioli Rpt.) ¶ 340.██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Ex. 6 (Akl Rpt.) ¶¶ 132-154. █████████████████████████████

████████████████████████████████████. *See, e.g.*, Ex. 8 (Thomas Tr.) at 181:5-9,

182:12-18, 183:14-19. Indeed, the Asserted Patents all claim priority to the same provisional

application (*see* Section II), they all have the same title and all disclose similar substance in their

specifications.

### B.    The Patentee Admits That the Purported "Inventive Concept" of the Asserted Claims Was Already Known

    Both the intrinsic record and ████████████████████████████ identify the

purported inventive aspect of the Asserted Claims as grounded in the concept of using a unique

identifier. But, the record  makes it clear that this concept was well known.

    The '562 Provisional, to which all Asserted Patents claim priority and incorporate by

reference, identifies the supposedly inventive aspects of the Patents, stating that the "present

invention is directed to a person wanting to share files, rich-media or other content by using a PIN

to grant access" `because "[c]urrent file, rich-media and content sharing is limited to URL sharing

to grant access." Ex. 1 ('562 Provisional). But, the specification of the Asserted Patents also admits

PUBLIC VERSION

████████████████████████████████████████████

that, at the time of filing, content-sharing was URL-based and content was well-known and

accessible by anyone with the URL:

> Online content sharing services allow a client to upload a file. The file may be
> identified by a uniform resource locator (URL). Other clients may access the file
> via the URL, and download the shared file.

'108 Patent at 1:15-18.

Mr. Thomas claimed that ████████████████████████████



████████████████████████ Ex. 8 (M. Thomas Dep. Tr.) at 181:5-9; *see Secured*

*Mail Sols. LLC v. Univ. Wilde, Inc.*, 873 F.3d 905, 909, 911 (Fed. Cir. 2017). Mr. Thomas's

testimony about ██████████ is not supported by the claims. Moreover, Mr. Thomas admitted

that ████████████████████████████████████. Ex. 8

(M. Thomas Dep. Tr.) at 181:13-19 ████████████████████████

████████████████████████ 180:15-19 ("███

██████████████████████████████.

The supposedly inventive "unique identifier" is simply data relating to "a QR code, bar

code, RFID tag, hexadecimal number, alphanumeric key, ASCII key, or UNICODE string." '108

patent at claim 1. The "shared content" is nothing more than a "file, calendar event, document,

picture, video, audio, streaming media, rich media, [or] application data." *Id*. at 5:10-12. Q Tech's

30(b)(6) deponent and sole inventor of the Asserted Patents made admissions t████████████

████████████████████████████████████

████████████████████████. *See* Ex. 8 (M.

Thomas Dep. Tr.) at 177:4-183:19.

Additionally, putting aside content sharing using unique URLs, Mr. Thomas admitted that

████████████████████████:



Ex. 8 (Thomas Dep. Tr.) at 168:4-169:20. Notably, the Asserted Claims do not limit "unique identifier" to ███████████████████████, to use Mr. Thomas's example. Nor do they require the "unique identifier" to be some variation of "short or small." They instead broadly state "unique identifier," which could be anything—including an email address, a URL, or the entirety of the text in this brief, if that is what the e.g. POSITA of the "invention" wanted to use as the "unique identifier."

Mr. Thomas also admitted that ████████████████████. *Id*. at 178:1-8, 180:15-19. ███████████████████████████████. *Id*. at 180:21-181:4. ███████████████████████████████████. *Id*. at 188:3-8. Mr. Thomas also admitted ██████████████████████████████████



*Id*. at 176:19-177:2.

Finally – as discussed in detail below in Section VIII – to the extent that Q Tech now attempts to argue through unsupported expert opinion that the supposed inventive concept is some improvement in novel "flow" of information, enhancements in privacy, instantaneous exchange of information between a first and second client, or improvements in network functionality, these concepts appear nowhere in the Asserted Claims nor are they taught by the specifications—on their face it is clear that these concepts are manufactured by Q Tech and its experts and are completely unsupported.

## IV.   PATENT INELIGIBILITY UNDER *ALICE* MAY BE DETERMINED AT SUMMARY JUDGMENT

Patent eligibility under § 101 is an issue of law that may be determined on summary judgment – or even earlier. *See USC IP v. Facebook, Inc.*, No. 6:20-CV-00555-ADA, 576 F.Supp.3d 446, 457 (W.D. Tex. Dec. 20, 2021) (Albright, J.); *see also e.g., Secured Mail*, 873 F.3d 905; *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 884 (Fed. Cir. 2019). While in some circumstances there may be facts that underlie some of the subsidiary inquiries at *Alice* Step 2, the Federal Circuit has emphatically reiterated that "not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Instead, "[p]atent eligibility has in many cases been resolved on motions to dismiss or summary judgment" and "[n]othing in [*Berkheimer*] should be viewed as casting doubt on the propriety of those cases." *Id.* "The mere existence in the record of dueling expert testimony does *not* necessarily raise a genuine issue of material fact." *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1325 (Fed. Cir. 2016) (emphasis added).

In *Alice*, the Supreme Court articulated a two-step framework for distinguishing patents that claim laws of nature, natural phenomenon, and abstract ideas from those that claim patent-

eligible concepts. *Alice*, 573 U.S. at 217. At *Alice* Step 1, the Court must "'determine whether the claims at issue are directed to a patent-ineligible concept' such as an abstract idea." *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1166 (Fed. Cir. 2019) (quoting *Alice*, 573 U.S. at 218). "If the claims are directed to a patent-ineligible concept, the second step of the *Alice* test requires a court to 'examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application.'" *Universal Secure Registry v. Apple Inc.*, 10 F.4th 1342, 1346 (Fed. Cir. 2021) (citations omitted). To recite an inventive concept, a patent must do more than recite an abstract idea "while adding the words 'apply it.'" *Alice*, 573 U.S. at 221 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72 (2012)). "[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Mayo*, 566 U.S. at 82. Likewise, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223.

## V.   THE ASSERTED CLAIMS FAIL *ALICE* STEP ONE

To pass the first step of *Alice*, claims must be directed to something more than an abstract idea. *Am. Axle v. Neapco*, 967 F.3d 1285, 1292 (Fed. Cir. 2020). "To determine what the claim is 'directed to' at step one, we look to the 'focus of the claimed advance.'" *Id.* at 1292-93 (citations omitted). The "claimed advance" must be captured in the claims themselves, not merely disclosed in the specification. *Id.* Thus, "features that are not claimed are irrelevant as to step 1 or step 2 of the *Mayo/Alice* analysis." *Id.*

Here, the Asserted Claims are solely directed to an abstract idea: sharing content using a unique identifier. The claims recite high-level desired functional results using conventional hardware and do not identify any special methods, interfaces, protocols, or data structures. The

Asserted Claims generally require receiving a shared content and a unique identifier from a first client at a server; receiving a request from a second client for access to the shared content, the request including the unique identifier; determining that the unique identifier is associated with a shared content; and sending the shared content to the second client. *See* '108 patent at claim 1; '473 Patent at Claim 14; '774 patent at claim 1. The functionality recited by the Asserted Patents – "receiving," "generating," "storing," and "determining" conventional information, like a QR code or an alphanumeric key as an identifier – describes generic human behavior that the Federal Circuit has repeatedly held cannot form the basis of eligible patent claims.

The Asserted Claims also are firmly within the category of claims "that do not focus on an improvement in computer as tools, but on certain independently abstract ideas that use computers as tools." *SAP AM., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018) (internal quotation marks and citation omitted). The Asserted Claims recite the following steps: shared content and a unique identifier are received, a unique identifier is assigned to the shared content, the shared content with a unique identifier is stored, a request including the unique identifier is received, the unique identifier is compared to a plurality of unique identifiers, and the shared content is sent. Each of these steps amount to nothing more than an action or task that has long been performed by the human mental process.

### A.     The Claimed Steps Have Long Been Performed by Human Minds, Pen and Paper, and Early Computing Systems.

Two simple examples – libraries and ticketing systems – illustrate that the claimed steps in the Asserted Claims are simply actions and tasks regularly performed by human minds, pen and paper, and early computing systems.

First, libraries have existed for centuries and have employed various organizational systems, such as the Dewey Decimal system, to store, reference, and retrieve content based on

████████████████████████████████████████████

unique identifiers. Libraries have multiple different types of content, such as books, periodicals, music, films, etc. (the shared content). The librarian (first client) can also generate shared content, such as the information stored in the card catalogue that describes the books and other materials in the library (e.g., title, author, ISBN, location, edition number, copyright, page count, etc.). The librarian (first client) stores the shared content in a "server" (e.g., books in stacks and descriptive information within the physical card catalogue) based on a unique identifier (i.e., the Dewey Decimal system identifier) that the librarian generates. A library patron (the second client) approaches the librarian, who provides the Dewey Decimal system identifier to the patron (receiving the unique identifier). The patron can then use the identifier to retrieve shared content from the "server," including descriptive information about the book (e.g., title and author from the card) or the book itself. Historically, a library patron (second client) was physically present near the librarian (first client) when the patron is notified that shared content exists. Whether by paper or electronic record, Libraries could notify a patron of the availability of content  at that library location or at other locations. For example, the librarian may tell the patron standing in front of him or her: "Yes, we have a copy of Romeo and Juliet. Please check in our card catalogue using the Dewey Decimal number 822.33.SHA."

In the library example, unique identifiers are created based on the content and the structures of the Dewey Decimal system (e.g., configuration settings). A Dewey Decimal identifier will identify a material by category, subcategory, call number, and author abbreviation.

**PUBLIC VERSION**



https://library.mpslakers.com/c.php?g=169174&p=1290346 (last accessed March 30, 2023).

Second, ticketing systems, whether for travel (air, train, bus, etc.), entertainment (concert, theater, etc.), or as proxies to store and retrieve goods (coat check, car valet, auction house, etc.), have existed for decades and implemented the same abstract ideas via both pen-and-paper and computing devices.




Available                                                                                    at

https://www.ebay.com/itm/154842906698?chn=ps&mkevt=1&mkcid=28&srsltid=AfAwrE5UA

42tqfd8FPb44PGn0qlDx7iGbBiB2D0Brsz82jYWFPi-3NdyECY (last accessed April 12, 2023) and https://www.flickr.com/photos/canadagood/7157691038 (last accessed April 12, 2023). As another example, well-known technology companies were implementing and patenting the use of

13

barcodes and NFC technology to transfer digital versions of tickets and related benefits. *See, e.g.*, https://www.engadget.com/2010-04-16-apple-files-patent-application-for-nfc-e-tickets-with-extra-benefit.html (last access April 12, 2023).

Each of these ticketing systems operated in a similar fashion long before the earliest effective filing date of the Asserted Patents: in each instance, the ticket provider (the first client) assigns a unique identifier to a shared content (e.g., a flight and seat assignment; a stadium section, row, and seat; etc.). That unique identifier is then given to the patron (the second client) via a paper or electronic ticket. The patron may then use the ticket and its identifier to make a request to verify the shared content and provide that information. These unique identifiers, including various barcodes, were generated based on the shared content as well as user and configuration settings. For example, an airline ticket may include the passenger's information, a specific fare indicator, seat, or the location of the departing flight. A concert or theater ticket may include a unique identifier based on the seat assignment, the date, and specific fare identifiers.  Ticketing systems also made determinations regarding whether the ticket provider and the patron were within a predefined distance. For example, an airline system may not allow a passenger at one airport to purchase a flight departing from a different airport at the same time as their current flight. Airlines also do not allow the passenger to validate their ticket and board a plane without being at the airport.

Like the libraries and tickets that have been around for years, the Asserted Patents do not recite any new hardware or techniques for sharing content. They rely upon the same types of clients and servers, to send the same types of messages using the same types of identifiers, as have been known for years. '108 patent at claim 1; '473 patent at claim 14; '774 patent at claim 1.

Libraries and ticketing systems are both simple examples of how the purported "advance" claimed by the Asserted Patents is nothing more than an abstract concept that has long been performed by human minds, pen and paper, and early computing systems.

**B.    The Federal Circuit Has Repeatedly Found Similar Claims to be Abstract – and Patent Ineligible**

Although there is no bright line rule that guides the Section 101 analysis, courts "have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). The claims at hand mirror claims that have been found patent ineligible by the Federal Circuit in several cases.

First, the Asserted Claims resemble those invalidated in *Secured Mail Solutions LLC v. Universal Wilde, Inc.* in all material respects. In *Secured Mail*, all of the patents at issue involved methods whereby computers and networks were used to communicate information about mail contents based on an identifier affixed to the object (e.g., envelope or package). *Secured Mail*, 873 F.3d at 907. The *Secured Mail* patents used either a barcode, QR code, or URL as an identifier. *Id.* at 907-08. Before the Federal Circuit, Secured Mail argued that its claims were patent eligible because they were "specifically directed to a sender-generated unique identifier, which improved on the existing process both by reliably identifying the sender of the mail object and by permitting the sender to create a bi-directional communication channel between the sender and recipient of the mail object." *Id.* at 910.

The Federal Circuit disagreed, holding that the claims were "not directed to specific details of the barcode or the equipment for generating and processing it" because "no special rules or details of the computers, databases, printers, or scanners [were] recited." *Id.* Instead, similar to the case at hand, the claims were directed to an abstract idea and merely "state[d] that various

identifiers are affixed to a mail object, stored in a database, scanned from the mail object, and retrieved from the database." *Id*.

The Federal Circuit rejected the idea that the unique identifier conferred patent eligibility, noting "[t]here is no description of how the unique identifier is generated or how a unique identifier is different from" long-standing identification practices. *Id*. at 910. The claims also did not recite any particular technical improvement, such as "specific details of the barcode or the equipment for generating and processing it." *Id*. Accordingly, the court found that the claims "embrace the abstract idea of using a marking affixed to the outside of a mail object to communicate information about the mail object." *Id*. at 911.

The Federal Circuit pointed out that, like the case at hand, the patentee in *Secured Mail* had made binding admissions of conventionality. The patent in *Secured Mail* acknowledged that the claims could be implemented using "devices generally known to those skilled in the art," such as "PDAs," "mobile phones," and "bar code readers," suggesting that the claims recited "conventional" hardware, and were not directed to a specific technological improvement. *Id*. at 912 ("Rather than citing a specific way to solve a specific problem…the asserted claims cite well known and conventional ways to allow generic communication between a sender and recipient using generic computer technology."); *accord id*. ("The use of barcodes was commonplace and conventional in 2001.").

Here, as in *Secured Mail*, the patented invention is not directed to how "the…identifier is generated" and certainly does not suggest how the claimed "identifier is different from" conventional identifiers. *Id.* at 912. Instead, the claims explicitly clarify that the unique identifier is "a QR code, bar code, RFID tag, hexadecimal number, alphanumeric key, ASCII key, or UNICODE string. '108 Patent at Claim 1. The claims do not require an inventive means for

"receiving" the "unique identifier"; the claims contemplate receiving the unique identifier via Bluetooth, Bluetooth Low Energy, NFC, Barcode or QR code scan, RFID tag scan, or communication from a first user of the first client to a second user of the second client (*id*.) - the last of which includes the first user telling the second user the unique identifier *verbally*. *Id*. at 4:25-28. And the mobile device itself is neither new nor inventive, as it may be any "computing device," much like the generic "devices" cited in *Secured Mail. Id.* at 3:33. Notably, the examples of the claimed device in the Asserted Patents are almost identical to the examples of generic devices recited in *Secured Mail*, which emphasized that the Asserted Claims are not eligible at Step 1 because they recite existing, unmodified devices. *Compare id.* at 3:37-44 ("desktop computer, laptop, smartphone, …personal digital assistant, set-top box, … mobile communication device"), *with Secured Mail*, 873 F.3d at 912 ("personal computers, set top boxes, personal digital assistances [*sic*] (PDAs), mobile phones").

Like the claims in *Secured Mail*, the Asserted Claims are not directed to specific details of the identifier or the equipment for generating and processing it because "no special rules or details of the computers, databases, printers, or scanners [were] recited." *Secured Mail*, 873 F.3d at 910. Instead, the Asserted Claims here recite purely functional steps, including "generat[ing]" a "unique identifier"; "receiving … shared content, and a unique identifier . . . for the shared content"; "assign[ing] a unique identifier, to … shared content"; "stor[ing] a shared content with a unique identifier"; "scanning [a QR code]"; "receiving … the unique identifier" from one client to another; "decode a unique identifier"; "receiving [a] . . . request comprising the unique identifier"; "comparing . . . the unique identifier to a plurality of unique identifiers"; "determining . . . that the unique identifier is associated with shared content"; "sending shared content . . . responsive to that determination." The unique identifier is described by well-known methods of representing data in

visual or machine-readable form, like a QR Code or an alphanumeric key. As the claims did in *Secured Mail*, the Asserted Claims here "embrace" an abstract idea.

Put simply, claims that "describe a problem, announce purely functional steps that purport to solve the problem, and recite standard computer operations to perform some of those steps" are abstract ideas. *NexusCard, Inc. v. Kroger Co.*, 173 F. Supp. 3d 462, 467 (E.D. Tex. 2016), *aff'd*, 688 F. App'x 916 (Fed. Cir. 2017) (granting motion to dismiss claims directed to "storing" and "scanning consumer ID," "comparing" it with "codes stored in said provider's computer and verifying said consumer's membership" to facilitate financial transactions). The Federal Circuit's analysis in *Secured Mail* demonstrates that the Asserted Claims merely recite the "purely functional steps" of "receiving," "generating," "comparing" and "determining," which lack sufficient detail to avoid abstractness. *NexusCard*, 173 F. Supp. 3d at 467.

Second, in *Bridge & Post*, the Federal Circuit analyzed three patents with claims directed to tracking a user's computer network activity and using information gained about the user to deliver targeted media, such as advertisements. *Bridge & Post*, 778 F. App'x at 884. The Federal Circuit held that the claims of the '314 patent were "directed to the abstract idea of communicating information using a personalized marking." *Id*. "Fundamentally, the claim is focused on 'generating' an identifier, 'tagging' the user's traffic with that identifier, and 'transmitting' the tagged traffic so that the user can be identified." *Id*. at 890.

The Court found that the claims in *Bridge & Post* "parallel[ed] the focus of the *Secure Mail* patents in a networking environment" and that "[i]n both cases, 'each step of the process is directed to the abstract process of communicating information about a mail [or network] object using a personalized marking.'" *Id*. (quoting *Secured Mail*, 873 F.3d at 911). In finding that the claims

were directed to an abstract idea, the court also noted that "[t]he remaining limitations do not offer any concrete technological improvement, and merely implement that abstract idea." *Id*.

Here, the Asserted Claims are also fundamentally similar to those invalidated in *Bridge & Post*. The *Bridge & Post* court emphasized that the claims' recitation of "generating a user identifier," "tagging … network traffic [with the user identifier]," and "transmitting the tagged network traffic to the destination site" were the functional steps of an abstract idea merely implemented in a networking environment, and that the remaining limitations did not offer any concrete technological improvement. *Id*. Similarly, the Asserted Claims recite purely functional steps (e.g., "generat[ing]" a "unique identifier"; "assign[ing] a unique identifier, to … shared content"; "receiving [a] . . . request comprising the unique identifier"; and "sending shared content . . . responsive to that determination"). The patented invention is not directed to specific details of how the unique identifier is generated, or how the unique identifier is different from long-standing identification practices. *Id*.; *Secured Mail*, 873 F.3d at 910.

Third, the Federal Circuit again found claims similar to Q Tech's to be patent ineligible in *PersonalWeb Techs. LLC v. Google LLC*.  In *PersonalWeb*, the district court found that the claims were directed to the steps of (1) using a content-based identifier generated from a hash or message digest function; (2) comparing that content-based identifier against another identifier or a request for data; and (3) providing (or not providing) access to data. 8 F.4th 1310, 1316 (Fed. Cir. 2021). The Federal Circuit held that the recited functions "are mental processes that can be performed in the human mind or using a pencil and paper." *Id.* at 1316 (internal quotations omitted). Notably, the Federal Circuit credited the example of a library as instructive, holding that "[l]ibrarians often locate books based on a 'call system' where they assign books unique identifiers based on call numbers, which change dependent on the book's volume, etc." *Id.* The court also rejected

████████████████████████████████████████

patentee's assertion that the claims contain an inventive concept because they "recite an application that makes inventive use of cryptographic hashes—a use that was neither conventional nor routine prior to the patents." *Id.* at 1318. Here, as in *PersonalWeb*, the claims are directed to the abstract idea of sharing content using a unique identifier. As the Federal Circuit recognized in *PersonalWeb*, this process has been carried out for years in human minds and with pencil and paper, including in library call systems. *See also* Section V.A. As in *PersonalWeb*, the claims here do not satisfy patent eligibility under Section 101.

Notably, *Secured Mail* and *Bridge & Post* were both decided at the pleading stage, before claim construction and discovery. Here, the Court has already construed the Asserted Claims and the parties have completed discovery, and the record still shows that the claims are directed to an abstract idea and lack an inventive concept. Because the Asserted Claims here suffer from the same fatal abstraction flaw as did the claims in *Secured Mail*, *Bridge & Post*, and *PersonalWeb*, they are similarly patent ineligible.

**C.     The Asserted Claims Do Not Fall Within the *DDR Holdings* Category of Patent-Eligible Computer-Implemented Patent Claims**

A computer-implemented patent claim may be eligible where it presents a "solution [that] is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC v. Hotels.com*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). As this Court recently held, a patent does not satisfy eligibility under *DDR* where "[t]he asserted claims do not solve an Internet-specific problem with an Internet-specific solution." *USC IP*, 576 F.Supp.3d at 455 (citing *DDR Holdings*, 773 F.3d at 1257). This standard is *not* met where, as here, "the claims simply recite conventional actions in a generic way without purporting to improve the underlying technology." *Universal Secure Registry*, 10 F.4th at 1357. Even claims directed to an "improved computer or network" are not patent eligible when "the specification

███████████████████████████████████

makes clear that off-the-shelf computer technology is usable to carry out the analysis." *SAP*, 898 F.3d at 1168. The Asserted Claims are not patent-eligible computer implemented patent claims.

First, the Asserted Claims do not offer a technical solution to a technical problem in the computer networking field. *DDR*, 773 F.3d at 1257; *USC IP*, 576 F.Supp.3d at 455; *SAP*, 898 F.3d at 1168. Instead, the Asserted Claims recite only generic and well-known technologies to carry out an abstract idea of sharing content using a unique identifier. For example, the claims recite generic hardware like "a server" and "a client." '108 patent at claim 1; '473 patent at claim 14; '774 patent at claim 1. These known hardware structures carry out well-known computer techniques and may happen to communicate *using* a network, such as in sending and receiving information in the form of "requests," "notifications," and "shared content." *Id.* The Asserted Claims also recite a "unique identifier" that comprises one of a number of well-known forms, including QR code, barcode, RFID tag, hexadecimal number, alphanumeric key, ASCII key, or Unicode string. '108 patent at claim 1; '473 patent at claim 14; '774 patent at claim 1. The Asserted Claims certainly are not directed to an improvement in the field of networking, or even related to the field of networking.

The Federal Circuit's analysis in *Secured Mail* is again instructive. *Secured Mail*, 873 F.3d at 910. In *Secured Mail*, the Federal Circuit distinguished *DDR Holdings* and found that the claims were "not directed to specific details of the barcode or the equipment for generating and processing it" because "no special rules or details of the computers, databases, printers, or scanners [were] recited." *Id.* Instead, the Federal Circuit found that the claims merely "state[d] that various identifiers are affixed to a mail object, stored in a database, scanned from the mail object, and retrieved from the database." *Id.* (invalidating claims to a customized QR code to track mail which relied on "devices generally known to those in the art").

As in *SAP* and *Secured Mail*, the Asserted Patents expressly provide that the concepts embodied by the Asserted Claims "may be implemented in any of numerous ways, as the described concepts are not limited to any particular manner of implementation." '108 Patent at 2:19-22. More particularly, the Asserted Patents describe a "computer system," which includes a first client, a second, client and a server, but not any particularized or special hardware. *See id.* at 2:25-3:32; 16:52-67 ("The term 'client' or 'server' include all kinds of apparatus, devices, and machines for processing data, including a programmable processor, a computer, a system on a chip, or multiple ones, or combinations of the foregoing. …).

Also, as in *Secured Mail*, the Asserted Patents confirm that the first and second clients/devices are not specialized devices and "may include any number and/or type of user-operable electronic device," such as "a desktop computer, laptop, convertible PC, smartphone, … or any other device configured to communicate with other computing devices, systems, and servers via the network 101." *Id.* at 3:33-44; *cf. Secured Mail*, 873 F.3d at 912 (claim abstract because it relied on "known" devices including "personal computers, set top boxes, personal digital assistances [*sic*] (PDAs), mobile phones"). Rather than disclosing a new type of client/mobile device, the specification takes pains to emphasize that only general-purpose computers are required: "The term 'client' or 'server' include all kinds of apparatus, devices, and machines for processing data, including a programmable processor, a computer, a system on a chip, or multiple ones, or combinations of the foregoing." *Id.* at 16:52-55. These well-known and conventional tools are ancillary to the claimed abstract idea and are therefore insufficient to confer eligibility.

In addition to relying on well-known and conventional components, the Asserted Patents emphasize that these conventional components communicate with each other using conventional means. Specifically, the '108 Patent discloses that the network "may include a local area network

(LAN), wide area network (WAN), a telephone network, such as the Public Switched Telephone Network (PSTN), a wireless link, an intranet, the Internet, or combinations thereof." *Id*. at 2:28-32. Similarly, the Patents disclose that communication between devices may be via Bluetooth signal, NFC, ultrasonic sound, email, short message service (SMS) text, instant messaging, speech, or by updating a website or a social networking site. *Id*. at 4:18-31.

Second, neither the Asserted Claims nor any part of the Asserted Patents identifies a specific technical problem rooted in computer networks. The *Background* section of the Patents is a scant three sentences, none of which identify a technical problem to be solved. And the Asserted Claims themselves only recite high-level functional results: shared content and a unique identifier are received, a unique identifier is assigned to the shared content, the shared content with a unique identifier is stored, a request including the unique identifier is received, the unique identifier is compared to a plurality of unique identifiers, and the shared content is sent. The Asserted Claims "do not enable computers to operate more quickly or efficiently, nor do they solve any technological problem." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020). Instead, they purport to address the age-old concept of sharing content with a unique identifier. *See supra* Section V.A. The ability to share content corresponding to an identifier is not a problem limited to computers, and was addressed long before computers existed. *Id*.

Because the Asserted Claims are neither necessarily rooted in computer technology nor attempt to overcome a problem specifically arising in the realm of computer networks, but instead invoke generic machinery to address problems long-solved by human minds, they are not patent-eligible computer implemented patent claims under *DDR* and its progeny. The Asserted Claims fail step one of the *Alice* test and are patent ineligible under Section 101.

## VI.    THE ASSERTED CLAIMS FAIL *ALICE* STEP TWO

The Asserted Claims fail to recite an inventive concept that would confer patent-eligibility at *Alice* step two. "To save a patent at step two, an inventive concept must be evident in the claims." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017); *see also Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (the focus of *Alice* step two is "the search for an inventive concept"). The inventive concept must provide "significantly more" than the abstract idea itself. *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1289-90 (Fed. Cir. 2018). "Well understood, routine, conventional" or "purely functional" claim elements cannot confer patent eligibility. *Alice*, 573 U.S. at 225; *In re TLI Commc'ns Patent Litig.*, 823 F.3d 607, 611-12 (Fed. Cir. 2016). Where claims lack an inventive concept, the Federal Circuit has held that no fact question is "material" to the eligibility inquiry, and thus cannot form the basis for denying summary judgment. Here, none of the elements of the Asserted Claims, alone or in combination, adds an inventive idea that would render them patent eligible.

### A.    The Asserted Claims Recite Conventional Tools, Not An "Inventive Concept"

As discussed above, the Asserted Claims rely solely on conventional tools to implement functional information-exchange steps that are specified at a high level of generality. "Providing generic devices that communicate with each other…is a conventional application of an abstract idea." *Sensormatic Elecs. v. Wyze Labs*, No. 2020-2320, 2021 WL 2944838, at *3 (Fed. Cir. July 14, 2021) (finding no inventive concept at *Alice* Step 2). Thus, claims lack an inventive concept when "[n]othing in the claims, understood in light of the specification, appears to require anything more than off-the-shelf, conventional computer, storage, network, and display technology for collecting the data related to financial transactions, and displaying the data to the users." *Bozeman*

███████████████████████████████████████████

*Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971, 980 (Fed. Cir. 2020). No additional structure is recited.

As discussed at length in Section V.B., *supra*, the Asserted Claims require nothing more than well-known, conventional computer technologies to perform content-sharing using a unique identifier. The Asserted Patents acknowledge as "background" that "[o]nline content sharing services allow a client to upload a file" and "[o]ther clients may access the file via the URL [identifier], and download the shared file." '108 patent at 1:15-19. Thus, at best, the Asserted Claims recite the same content sharing techniques performed for many years in brick and mortar libraries or on the internet using an identifier received via means such as a conventional QR code scan or verbally communicated from one user to another. '108 patent at claim 1; '473 patent at claim 14; '774 patent at claim 1. But using an identifier received by these well-known and conventional means to upload and download the same shared content between the same clients and the same server is not an inventive concept. Indeed, the Asserted Patents recite the same type of generic components and steps that the Federal Circuit has repeatedly found to lack inventive concept. *See, e.g.*, *Secured Mail*, 873 F.3d at 912 ("The claim language does not provide any specific showing of what is inventive about the identifier or about the technology used to generate and process it. The district court is correct that the sender-generated identifier is not a sufficiently inventive concept."); *Bridge & Post*, 778 F. App'x at 892-93 (specification confirmed that alleged inventive concept was known and conventional); *PersonalWeb*, 8 F.4th at 1318-19 (alleged inventive use of "cryptographic hashes" or "message digest" functions in place of conventional names did not provide inventive concept). Similarly, here, Q Tech's alleged use of a unique identifier to retrieve shared content cannot provide the inventive concept required under Section

101, particularly given the well-known content sharing techniques that existed before Q Tech's patents.

The Asserted Patents recite generic devices that were well known at the time of the invention and are not inventive because they were conventional tools ancillary to the claimed abstract idea. Prior to the earliest effective filing date of the Asserted Patents, there were numerous computing systems that utilized unique identifiers, including QR codes, to transfer content and data between devices. The Asserted Patents did not include any new or novel component or element. Each claimed component was well known and widely used. Nor did the Asserted Patents identify a novel combination of known elements. Instead, the Asserted Claims merely take the age-old concept of sharing information using an identifier and apply it with an off-the-shelf computer. In other words, the claims reflect a sequence performed in a logical order dictated by the abstract idea, and does not "transform the nature of the claim into a patent-eligible application" "as an ordered combination." *See Alice*, 573 U.S. at 217-18; *Two-Way Media Ltd. V. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017) ("Merely reciting the use of a generic computer or adding the words 'apply it with a computer' cannot convert a patent-ineligible abstract idea into a patent-eligible invention.").

**B.      The Claimed Steps Are Generic Functional Language, Not an "Inventive Concept"**

The Asserted Claims recite nothing more than "generic functional language to achieve the[] purported solutions." *Two-Way Media*, 874 F.3d at 1339. The claims in *Two-Way Media* were directed to the abstract idea of "(1) sending information, (2) directing the sent information, (3) monitoring the receipt of the sent information, and (4) accumulating records about receipt of the sent information." *Id.* at 1337. Like Q Tech, the plaintiff in *Two-Way Media* argued "that the claim solves various technical problems" relating to the flow of information. *Id.* at 1339. But, as with Q

███████████████████████████████████████████████

Tech, *Two-Way Media's* claim did not specify an alleged inventive concept or technical solution beyond generic computer functionality. *Id.*

Here, the Asserted Claims recite generic and well-known functions, including "receiving," "generating," "storing," and "determining" conventional information, like a QR code or an alphanumeric key as an identifier.  '108 patent at claim 1; '473 patent at claim 14; '774 patent at claim 1.  Even Q Tech's expert ███████████████████████████████████

████████████████████████████████.  *See* Ex. 6 (Akl Report) ¶¶ 138-140; Ex. 9 (Zatkovich Invalidity Report) ¶¶ 152-157. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████. Ex. 8 (M. Thomas Depo. Tr.) at 177:19-25, 181:13-19.

As in *Two-Way Media*, the Asserted Claims simply do not recite any technological advancement beyond the abstract idea of content sharing described above in Section V.A. *Two-Way Media*, 874 F.3d at 1339; *see also Elec. Power Grp.*, 830 F.3d at 1355 ("Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technologies for gathering, sending, and presenting the desired information.").

**C.   Q Tech's Latest "Inventive Concept" Is Not Claimed and Therefore Irrelevant**

Finally – as discussed in detail below in Section VIII – to the extent that Q Tech now attempts to argue through unsupported expert opinion that the supposed inventive concept is, for example, ███████████████████████████████████████████

███████████████████████████████████████████████

████████ these concepts appear nowhere in the Asserted Claims and are completely unsupported. Again, the relevant test under *Alice* is "whether the claims at issue are directed to a patent-ineligible concept," *Solutran*, 931 F.3d at 1166 (quoting *Alice*, 573 U.S. at 218). More to the point, "features that are not claimed are irrelevant as to step 1 or step 2 of the *Mayo/Alice* analysis." *Am. Axle*, 967 F.3d at 1292.

The Asserted Claims fail step two of the *Alice* test and are patent ineligible under § 101.

## VII.   BINDING ADMISSIONS FORECLOSE A "GENUINE" DISPUTE OVER ANY MATERIAL FACTS

Section VI.A demonstrates why the claims do not contain an inventive concept and why there are no facts that are "material" to eligibility here. To the extent the Court disagrees and finds there are "material" facts, there can be no "genuine dispute" over those facts in light of binding admissions in the specification and prosecution history, confirmed by statements by the patentee himself and his expert.

First, "[i]n a situation where the specification admits the additional claim elements are well-understood, routine, and conventional, it will be difficult, if not impossible, for a patentee to show a genuine dispute" sufficient to withstand summary judgment. *Berkheimer v. HP Inc.*, 890 F.3d 1369, 1371 (Fed. Cir. 2018). The Federal Circuit applied this principle in *Secured Mail* to find a patentee's QR code patents ineligible, rejecting the patentee's objection that "questions of fact" precluded a determination at Step 2. 873 F.3d at 912. *Secured Mail* explained that "[t]he fact that many of these technologies were well known can be discerned from [the patentee's] patents themselves." *Id.* The Federal Circuit "determined claims to be patent eligible…based on intrinsic evidence from the specification," which rendered the claims ineligible as a matter of law, obviating "need for 'extraneous fact finding outside the record.'" *Id.*

███████████████████████████████████████████████

As in *Secured Mail*, the "intrinsic evidence from the specification" is sufficient to answer any potential fact question. 873 F.3d at 912. The Asserted Patents' common specification discloses three key components—a first device, a second device, and a server to perform the communication—all of which are expressly described as well-known technologies. *See* '108 Patent at 16:52-55 ("The term 'client' or 'server' include all kinds of apparatus, devices, and machines for processing data…."); Claim 1 ("unique identifier" described by well-known methods of representing data in visual or machine-readable form); 5:10-12 (well-known data types as "shared content"); 2:28-32 (well-known networks); 4:18-31 (well-known methods of communication between clients). The Asserted Patents even recite several of the exact same examples of technologies that were deemed too generic to be inventive in *Secured Mail*. Thus, as in *Secured Mail*, the "fact that many of these technologies were well known can be discerned from [the patentee's] patents themselves." 873 F.3d at 912.

Similarly, as discussed in Sections III.A., III.B., V.B. above, Q Tech and Q Tech's expert have already confirmed the conventionality of the technical structure recited in the claims and that the "inventive concept" was already known.

To the extent that there are facts "material" to eligibility here (there are not) there can be no "genuine dispute" over those facts in light of binding admissions in the specification and prosecution history, confirmed by statements by the patentee himself and his expert.

## VIII. CONCLUSORY EXPERT OPINION CANNOT MANUFACTURE A GENUINE ISSUE OF MATERIAL FACT

In this case, Q Tech engaged an expert, Dr. Robert Akl, to opine on the validity of the Asserted Patents. Ex. 6 (Akl Rpt.) ¶¶ 132-154. Dr. Akl opines ████████████████████
████████████████████████████████████████████████████ Ex. 6 (Akl Rpt.) ¶ 136. As a threshold matter, as discussed above in Section V.B., Dr. Akl's assertions

are irrelevant because any discussion of ███████████ is not the relevant inquiry under *Alice.*
*See e.g., Am. Axle*, 967 F.3d at 1293 ("features that are not claimed are irrelevant as to step 1 or
step 2 of the *Mayo/Alice* analysis" ).

Moreover, Dr. Akl does not support his assertion with any intrinsic evidence.  Nor could
he, because the Asserted Patents do not discuss █████████████████████ – and certainly
nothing new relative to well-established and basic server/client communications.  Indeed, the
section of Dr. Akl's report addressing patent eligible subject matter ███████████████
████████████████████████████.  Nor has Q Tech (or its expert for that matter)
actually delineated ███████████████ that are at the heart of its Asserted Claims.
Conclusory expert opinion unsupported by facts cannot manufacture issues of material fact
sufficient to survive summary judgment. *K-TEC, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364 (Fed. Cir.
2012); *Reckitt Benckiser LLC v. Aurobindo Pharma. Ltd. et al*, 1-14-cv-01203, Dkt. 174 at *16
(D. Del. Mar. 6, 2017).

To the contrary, Dr. Akl's testimony *supports* a finding of ineligibility. As discussed above
in Section III.A., when faced with the reality that the Asserted Patents recite conventional and
well-known technology, Dr. Akl admits ████████████████████████████
████████████████████████████████████████████████
██████████████████ Ex. 6 (Akl Rpt.) ¶ 153. Dr. Akl's admission about
████████████ is fatal, and his conclusory opinions ███████████████████
████████████████████████████████████. *Two-Way Media*,
874 F.3d at 1339.

Dr. Akl's report ████████████████████ of the claims in an effort to
avoid the inevitable conclusion of invalidity. For example, Dr. Akl asserts that ███████████

███████████████████████████████████████████

███████████████████████████████████████████████████████ *Id.* ¶¶ 135, 138,

140. But the patents do not limit its disclosures of peer-to-peer communications (e.g., Bluetooth,

email, etc.) to simply sending or receiving the unique identifier, nor do the patents exclude sending

and receiving shared content by URL's. *See, e.g.,*'108 patent 17:54 - 18:6 (describing the invention

as including "sending web pages to a web browser on a user's device in response to requests

received from the web browser.").  Dr. Akl's analysis relies on ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████

*Id.* ¶ 151. But stating that something is new and unconventional does not make it so.  Simply put,

Dr. Akl's analysis discusses ████████████████████████████████ ███

████████████████████████████████ Numerous content sharing

systems that existed at the time of the Asserted Patents did not ██████████████████████

███████████████████████████████████████████

██████████████████████████ *Id.* ¶ 148. Dr. Akl's purported

"problem in the prior art" was solved dozens of times over before any of the Asserted Patents were

filed.

Dr. Akl's analysis also incorrectly asserts that the Asserted Patents ████████████████

███████████████████████. *See, e.g.*, *id.* ¶ 64; *see also id.* ¶ 135 ("███

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████). But this

analysis has no basis in the Asserted Patents. Rather, Dr. Akl states that ████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████Hethen offers the unsubstantiated conclusion that ██████████████

████████████████████████████████████████. *See, e.g., id.* ¶ 136. But Dr.

Akl's analysis lacks consistency when describing the alleged improvements.  For example, he first

states that █████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████ *Id.* ¶¶ 141, 143. Dr.

Akl also alleges, without providing any evidence, that the "███████████████████████████

████████████████████████████████████████." *Id.* ¶ 143. Lastly, Dr.

Akl does not identify any claim directed to the improvement of either a computing device or the

performance of a computer network. Nor can he, because the "computer network" described by

the patents is a generic system that was already well-known and widely used.

Dr. Akl's analysis points to alleged "█████████ that the Asserted Patents never claim or

require, and thus cannot save the actual written claims. The Asserted Claims include no

requirements about ███████████████████████████████████████████████████. Nor do

the Asserted Patents or Asserted Claims speak to █████████████████████████████████. The

claims do not require █████████████████████████████████████████████. And they

**PUBLIC VERSION**

██████████████████████████████████████████

do not require, or even mention, the use of ████████████. Q Tech's experts cannot alter the ineligibility of these patent claims by fabricating supposed benefits and differences[1].

## IX.     THE ASSERTED CLAIMS FAIL BOTH STEPS OF *ALICE* AND ARE PATENT INELIGIBLE UNDER SECTION 101

This is one of the "many cases" where "patent eligibility" should be "resolved on… summary judgment." *Berkheimer*, 881 F.3d at 1368. *Secured Mail* and *Bridge & Post* are applicable and conclusive. The patentee's own admissions foreclose any doubt. This Motion should be granted.

Dated: June 20, 2023                              Respectfully submitted,

                                                 By: */s/ Kathryn Riley Grasso*
                                                     Kathryn Riley Grasso
                                                     Christian Chessman
                                                     Henry R. Fildes
                                                     **DLA PIPER LLP (US)**
                                                     500 Eighth Street NW
                                                     Washington, DC 20004
                                                     Tel: (202) 799-4000
                                                     Fax: (202) 799-5000
                                                     kathryn.riley@us.dlapiper.com
                                                     christian.chessman@us.dlapiper.com
                                                     henry.fildes@us.dlapiper.com

                                                     John M. Guaragna
                                                     State Bar No. 24043308
                                                     Zachary A. Loney
                                                     State Bar No. 24092714

---

[1] Dr. Brogioli's opinions are in accord with those of Dr. Akl on this issue. For example, Dr. Brogioli ████████████████████████████████████████████████████████ ████████████████████████████████████████████████". Ex. 7 (Brogioli Rpt.) ¶¶ 408-409.  For the '894 patent, Dr. Brogioli also points to ████████████████████████████████ ██████ *Id.* ¶ 409. The '894 patent also discloses that the server can send a confirmation of transferred funds that "may comprise a textual notification comparable to a receipt," which is akin to what QTech accuses as "shared content" in this case. Ex. 10 ('894 patent) at 25:30-51. Dr. Brogioli's opinion about the '894 patent confirms that ██████████████████████████ ████████████████████████—were conventional steps and already known in the art.

**PUBLIC VERSION**

████████████████████████████

**DLA PIPER LLP (US)**
303 Colorado St., Suite 3000
Austin, TX 78701
Tel: 512.457.7125
Fax: 512.457.7001
john.guaragna@us.dlapiper.com
Zachary.loney@us.dlapiper.com

Jackob Ben-Ezra
**DLA PIPER LLP (US)**
845 Texas Avenue, Suite 3800
Houston, TX 77002
Tel: (713) 425-8400
Fax: (713) 425-8401
jackob.ben-ezra@us.dlapiper.com

Benjamin Yaghoubian
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067-4735
Tel: (310) 535-3000
Fax: 310-595-3300
Benjamin.Yaghoubian@us.dlapiper.com

**ATTORNEYS FOR DEFENDANT
WALMART INC.**

**PUBLIC VERSION**

████████████████████████████

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served on June 20, 2023, with a copy of this document via electronic mail on this same date.

*/s/ Kathryn R. Grasso*
Kathryn R. Grasso
